MAE GILLIGAN et al., on Behalf of Themselves and All Tenants of 1070 Park Avenue, Similarly Situated, Appellants, *v.* TISHMAN REALTY & CONSTRUCTION Co., INC., et al., Respondents.

First Department, December 15, 1953.

*John F. X. Finn* of counsel (*Martin V. Callagy, David M. Palley, Julius L. Neidle* with him on the brief; *David M. Palley, Julius R. Oltarsh* and *Julius L. Neidle,* attorneys), for appellants.

*Charles H. Tally* of counsel (*Reuben Tally* with him on the brief; *Charles H. Tally,* attorney), for Tishman Realty & Construction Co., Inc., and others, respondents.

*Robert S. Fougner* of counsel (*McLaughlin & Fougner,* attorneys), for Maurice Mound and others, respondents.

BOTEIN, J. This action is brought by a number of tenants of a Park Avenue multiple dwelling, who seek a declaratory judgment declaring in essence that a plan for the co-operative ownership of the apartment building was illegally conceived and executed and therefore never became legally operative;

and also that illegal pressures were exerted by the defendants to cause tenants to purchase stock in the co-operative venture. The defendants may be divided into two groups. One consists of corporations and individuals that shall be referred to as " Realty ", because there is little dispute that their concerted activities in presenting the co-operative plan to the tenants were sponsored and directed by the defendant Tishman Realty & Construction Co., Inc. The second group of defendants consists of the so-called co-operative corporation and its stockholders.

The plaintiffs are all statutory tenants. Each such tenant " thus remains in possession, not by virtue of any agreement, express or implied  *  *  *  but by virtue of the compulsion which the law exerts on the landlord to allow him to remain " (*Stern* v. *Equitable Trust Co.*, 238 N. Y. 267, 269). Under certain circumstances the compulsion may be lifted and the landlord may recover possession of the housing accommodation (State Residential Rent Law, L. 1946, ch. 274, § 5, as amd.). In order to recover such possession, however, the landlord must be granted a certificate of eviction by the Temporary State Housing Rent Commission (Administrator), designed to permit the landlord to pursue his remedies at law. In 1951 the commission, pursuant to its powers under paragraph a of subdivision 4 of section 4 of the State Residential Rent Law (L. 1951, ch. 443), promulgated a regulation establishing a procedure for the granting of a certificate of eviction to a purchaser of stock in a co-operative corporation, who thereby acquires a proprietary lease to an apartment in the co-operative building and the status of " landlord " under the regulation. We have recently held that the promulgation of this regulation was a valid exercise of the Administrator's powers (*People ex rel. McGoldrick* v. *Sterling*, 283 App. Div. 88).

The practical and implementing effect of the judicial declaration sought by the plaintiffs would be a holding that certificates of eviction should not be issued to purchasers of stock allocated to apartments presently occupied by plaintiffs, who enjoy the status of statutory tenants.

A trial was had at Special Term, and at the close of the plaintiffs' cases the Justice presiding dismissed the amended complaint. Plaintiffs appeal from this judgment of dismissal.

There is little doubt that Realty bought the building with the purpose in mind of organizing a co-operative corporation and selling the building to it at a substantial profit. Plans for launching an elaborate campaign to turn the building into a

co-operative one were initiated immediately after Realty took title. This profit-making objective, in and of itself, is not illegal (*Matter of Hoenig* v. *McGoldrick,* 281 App. Div. 663); and it does not appear that the amount which Realty fixed as the sale price of any of the seventy-two apartments in the building was unfair or discriminatory. The emergency rent statutes and implementing regulations do not proscribe the profit motive — provided its unrestrained exercise does not result in "exactions of unjust, unreasonable and oppressive rents and rental agreements." (Declaration and Findings, State Residential Rent Law.)

Of course, there is small likelihood of any co-operative plan springing spontaneously from among the tenants, who are usually and understandably quite content to maintain the status quo. Therefore, an owner in search of profit may properly give impulse to a co-operative movement to purchase his building. He may promulgate the plan, he may present it to his tenants, and in so doing he may explain the advantages of the plan and properly persuade them to purchase apartments. He may expound the applicable law — correctly — and if that law strikes the tenants as harsh and oppressive the owner is under no obligation to soften literal compliance by one jot. Nothing will be found in the Emergency Housing Rent Control Law or in the applicable regulations (Rent and Eviction Regulations, § 55, subd. 3, particularly) inhibiting such activities of an owner. The defendants' good faith is tested by the spirit and the letter of the emergency rent statutes and regulations; and not by tenants' notions of fair play. But by the same token the defendants must comply substantially with the requirements of statute and regulation, at the risk of otherwise forfeiting their rights to certificates of eviction.

Plaintiffs contended that the Realty timetable of operations was calculated to and did bring the dread spectre of eviction to the tenants — an outcome, however, possible under the law. The communications sent to the tenants were certainly not framed to reassure them as to continued occupancy if they refused to buy their apartments; but they were substantially and technically accurate. It must be realized that the very presentation of such a plan precipitates a war of nerves between landlord and tenants. Some of the communications may have implied to laymen greater progress toward consummation of the plan, and the consequent eviction of nonpurchasing tenants, than the actual facts would warrant; and they may also have implied that Realty and its well-controlled agents were acting

independently of one another and negotiating at arm's length. There was also reference to a dubious option Realty had given the purported promoters. On the whole, however, we are inclined to agree with the learned Trial Justice that at least in purchasing the property and in making the early representations and offers to sell to tenants, Realty was doing nothing more than what it had a legal right to do. It cannot be held, therefore, that this plan was so permeated with fraud or illegality in its conception, inception or early presentation as to warrant a declaration that the plan itself is illegal.

The real issue in this case is whether Realty, or the so-called co-operative corporation, which was clearly controlled by Realty, applied pressures of an illegal nature in their efforts to sell stock to tenants after the initial presentation of the plan. There is substantial evidence from which inferences may be drawn that only a negligible number of tenants in occupancy had purchased stock and secured proprietary leases for their apartments prior to the original cut-off date fixed by Realty; that the entire co-operative enterprise had bogged down, to the dismay of Realty; and that to consummate the plan it made threats not justified under the circumstances, made material misrepresentations, offered premiums to tenants to move out and discriminatory contracts to tenants to purchase their apartments, all in an effort to stampede the tenants into purchasing or vacating their apartments.

Subdivision 3 of section 55 of the Rent and Eviction Regulations of the Temporary State Housing Rent Commission, governs the issuance of certificates of eviction in a co-operative-owned building (see the comprehensive discussion thereon by Mr. Justice BREITEL, in *People ex rel. McGoldrick* v. *Sterling, supra*). This regulation, decisive herein, was proposed by the State Rent Administrator on January 15, 1951, in a rent control plan he submitted to the Legislature. In urging the regulation dealing with the subject of co-operatives, the Administrator said: "In proposing this change in the Regulations, the Commission does not intend to abandon its position that the right of the recent purchaser of stock allocated to a cooperative apartment to evict the tenant in possession must be limited to avoid improper pressures upon such tenants to purchase stock in dormant or new corporations." The point need not be labored that this position taken by the Administrator reflects the spirit and philosophy of the Emergency Housing Rent Control Law. Other courts have not needed so explicit a guideboard to impose on promoters of co-operative

apartment ventures the most rigid standards of fair dealing and good faith toward tenants (*Woods* v. *Burg*, 82 F. Supp. 242; cf. *Woods* v. *Krizan*, 81 F. Supp. 121).

These are some of the tactics allegedly employed by Realty and those under its control — among whom was the co-operative corporation. It was conceded upon the trial that Realty sold apartments to eight tenants and agreed to repurchase them within a stated period, in most instances at a profit, at the tenants' option. In one case it gave a tenant a two-year option to resell his apartment back to Realty at a $1,000 profit. After the early discouraging reaction to the plan the offer to repurchase was apparently extended to a large group. To appreciate all the implications of these resale agreements, the provisions of subdivision 3 of section 55 relating to eviction of nonpurchasing tenants must be borne in mind. The pattern for sale of an apartment involves the purchase of stock in the co-operative corporation and the giving of a proprietary lease of the apartment to the purchaser of stock. A certificate of eviction, under the circumstances presented here, shall be issued by the Administrator to such a proprietary lessee (1) when he acquired the stock more than two years prior to the filing of his application for the certificate of eviction, or (2) at any time after stock in the co-operative has been purchased and proprietary leases acquired by persons who are tenants in occupancy of at least 80% of the dwelling units in the structure. To the extent applicable here, a " tenant in occupancy " is (1) a person who purchased the stock allocated to a vacant apartment; or (2) a person who while he was a tenant in occupancy in the building, purchased the stock allocated to his or some other housing accommodation in the building for personal occupancy.

Obviously, the most obsessing fear of a tenant confronted with a co-operative proposal, and the most paralyzing weapon in the arsenal of the promoter, is the possibility that 80% of the tenants will purchase stock and that immediate application will be made for the eviction of the nonpurchasing tenants. In a tight rental market, when it is most difficult to obtain comparable dwelling space, tenants check the sales to their cotenants; and if they feel that substantial progress is being made toward procuring the dreaded 80%, many will perforce capitulate.

The incidence of these eight repurchase agreements is more significant than their mere arithmetical ratio to the seventy-two apartments in the building. As of June 25, 1951, almost a

month after the outside date originally given by Realty to the tenants to make their decisions, only sixteen apartments had been sold. Three had been sold to persons bearing the name of the individual promoters and four to tenants under repurchase agreements, so that the residuum of unchallengeable sales was only nine apartments sold out of seventy-two. It may be that the repurchase agreement represented a device to stampede the entrenched tenants into acceptance of the plan.

No explanation has been furnished by the defendants of the purpose of the repurchase agreements. No testimony has been offered to rebut the possible inference that these agreements may have been offered as a form of discriminatory inducement to articulate opponents of the plan, to stifle their opposition and shatter the morale of the other tenants. One of the leaders of the tenant opposition testified that the defendants offered to purchase his apartment at a price much higher than the price listed in the plan and then sell him another vacant apartment in the building at the list price, so that the cost of the apartment he would eventually occupy would be substantially less than the price at which it was listed. Another tenant testified he was offered a premium to move out.

Passing to other pressures allegedly asserted against the tenants, five of them testified that Realty had made some threats about their families' '' sleeping in Central Park '' if they did not purchase apartments. Others testified they were told their apartments would be sold '' right from under '' them; that the apartments would be sold the next day if answers were not forthcoming. There was testimony of material misrepresentations about the effect of the rent laws. Statements were made and letters were sent, and a newspaper release inspired, to the general effect that the building had been sold to a tenant group, which could easily have misled tenants illiterate in the language of the law to believe that the promoter had sold 80% of the apartments to tenants in occupancy.

These charges have been made by men of apparent standing and substance, and are, of course, undenied. We believe the plaintiffs have made out a prima facie case in support of their assertion that, after the proposed co-operative venture was launched, illegal and improper pressures were exerted by the defendants sufficiently strong to have necessitated putting the defendants to their proof, and that the complaint should not have been dismissed at the close of the plaintiffs' case.

The defendants urge laches, an aspect of the case apparently not dealt with by the trial court. In view of the fact that this

action was commenced within five weeks after Realty sold the property to the alleged co-operative corporation and declared the plan effective, and in view of the allegedly accelerated tempo of the improper pressures up to and after that date, this defense should be passed on at the new trial.

Also, defendants maintain, as matter of law, that our holding in *Judson* v. *Frankel* (279 App. Div. 372) must be limited to a " proposed " co-operative, arguing, as I gather it, that this co-operative is consummated because a stock corporation has been formed. There is no validity to this contention, as otherwise a promoter could elude court review by forming a corporation contemporaneously with mailing out his plan to the tenants; and there is no reason why a co-operative corporation legitimate in its origin should not later be brought to book for the sins committed in its name. It should be noted in this connection that in *Matter of Hoenig* (*supra*) relied on so heavily by defendants, thirty-one out of the thirty-nine apartments (80%) were owner-occupied when the case came on for trial.

The remedy of declaratory judgment may well be appropriate here, in the broad discretion of the trial court, if the plaintiffs sustain their burden of proof upon the issues stated above. Such a declaration may still serve a useful purpose in advising the parties and the Administrator of their respective rights and powers in the situation. Concededly, as of the date of trial, a year and a half after the plan was launched, only twenty-seven purchasers were actually in possession of their apartments — in a building of seventy-two apartments. Some of these sales, of course, were made under the repurchase agreement and to members of the defendants' families. The defendants are still considerably short of the requisite 80%. Therefore, a great many tenants, including thirty-two of a larger number of plaintiffs who have joined in this appeal, seek to have their status determined more definitively than it is now. These tenants still " have such an interest in the matter as to entitle them to court consideration and declaration of the sufficiency of defendants' presentation of the plan " (*Judson* v. *Frankel*, 279 App. Div. 372, 375).

We have already, impliedly if not expressly, held that exclusive primary jurisdiction to determine the plaintiffs' possessory rights is not vested in the State Rent Commission, as contended by respondents (*Judson* v. *Frankel, supra*; *Matter of Hoenig* v. *McGoldrick*, 281 App. Div. 663). Also, there is no point in permitting equities to harden still further by relegating tenants

to the alternative of some future appearance before the Administrator, to oppose issuance of certificates of eviction, a contingency which in the case of many of the plaintiffs may not arise for years. Furthermore, as we have seen, tenants do succumb to pressures and purchase or vacate their apartments. The ranks of statutory tenants may become so decimated that there will be few, if any possessing the status to challenge the issuance of certificates of eviction.

Moreover, the Administrator himself, in his opinion as partially quoted at Special Term in *Matter of Hoenig* (115 N. Y. S. 2d 913, 915) stated: " ' * * * he [the Administrator] cannot embark upon an inquiry into the reasons for which the various tenants in occupancy purchased the shares of stock allocated to their apartments * * * the validity and fairness of a proposed cooperative plan can best be determined if the interested parties find such determination necessary by a court of competent jurisdiction.' "

In short, the occasion for declaratory judgment and implementing incidental relief in this case, assuming that plaintiffs are able after a trial to establish their factual claims, would be (1) that the use of illegal pressures renders inapplicable the privileges extended by subdivision 3 of section 55 of the regulations to holders of certain proprietary leases, and (2) that the use of repurchase options may constitute a device to counterfeit a prima facie but not a genuine compliance with the provisions of the regulation relating to the definition of " landlords " in the case of proprietary leases. The scope of the relief, possibly curative as well as injunctive, that may be granted will be indicated by the date of the effective institution of the illegal pressures and other relevant circumstances. Consideration may be given to the formula set forth in the concluding paragraphs of the opinion in *People ex rel. McGoldrick* v. *Sterling* (*supra*).

The judgment appealed from should be reversed and a new trial ordered in accordance with this opinion.

COHN, J. P. (dissenting). Plaintiffs are statutory tenants of the apartment house at 1070 Park Avenue, borough of Manhattan. As of May, 1953, the date upon which this record on appeal was settled, eleven of the plaintiffs named no longer had any interest in the appeal — six having purchased their apartments and five having moved out of the building. As of this date, all of the seventy-two apartments have been sold — forty-eight to persons in possession, the others to persons desiring possession.

A plan for co-operative ownership of the apartment house, proposed on April 16, 1951, had become effective as of September 25, 1951, and the premises were conveyed to the co-operative apartment house corporation. After a substantial number of tenants and others had purchased apartments and obtained proprietary leases, plaintiffs instituted this suit praying for a declaratory judgment to the effect that (1) the co-operative apartment house owner, 1070 Park Avenue Corporation, was not a co-operative corporation; (2) the plan for the sale of co-operative apartments was not entered into in good faith and was contrary to the laws of this State; and (3) certain of defendants who were purchasers of the apartments and the stock allocated thereto be adjudged not entitled to the possession of such apartments. An injunction to enjoin any sale of such stock and apartments is demanded together with damages.

Plaintiffs' sole protection for occupancy of their apartments as statutory tenants is to be found in the State Residential Rent Law (L. 1951, ch. 443, as amd. by L. 1953, chs. 320, 321). Under that statute and regulations issued pursuant thereto, statutory tenants of a building co-operatively owned may not be evicted unless or until either (a) a particular proprietary lessee has owned the stock to his apartment for at least two years or (b) 80% of the apartments are occupied by proprietary owners.

Once a co-operative has been organized, the protection afforded to a statutory tenant is solely within the discretion of the State Rent Administrator, who, it is to be noted, has not even been made a party to this suit. A tenant of controlled premises is entitled to possession of his apartment, so long as he pays the rent due, subject to exceptions set forth in the statute and regulations. He may be removed only if a certificate of eviction is first obtanied from the State Rent Administrator. If plaintiffs can establish to the satisfaction of the Administrator that the plan adopted by defendants is being effectuated by means of illegal pressures, the Administrator would have the right to seek injunctive relief on defendants' behalf, pursuant to section 11 of the rent statute. Indeed, if upon a hearing, claims of alleged improper methods employed to make effective the co-operative corporation are raised and established he would have the discretion to refuse to issue a certificate of eviction to the petitioning landlord. Even if the Administrator should issue a certificate of eviction, the tenant might still attack the regulations of the State Rent Administrator or any order made by him in an eviction proceeding, for the Adminis-

trator's determination is always subject to review by this court under article 78 of the Civil Practice Act. (State Residential Rent Law, § 9.)

In the case of *Judson* v. *Frankel* (279 App. Div. 372) upon which plaintiffs seem to rely for their claim to relief by way of declaratory judgment, the court was dealing with a case where a co-operative corporation was to be formed in the future and the tenants were being requested to subscribe to an enterprise not yet in being. Here defendant 1070 Park Avenue Corporation, the co-operative enterprise, is in existence and more than half the apartments have already been sold to purchasers in good faith. Once the co-operative corporation has been organized and apartments therein have been sold, the proper area of inquiry is whether or not the landlord has established compliance with subdivisions 3 and 4 of section 55 of the Rent and Eviction Regulations of the Temporary State Housing Rent Commission. (*Matter of Hoenig* v. *McGoldrick*, 281 App. 663, motion for leave to appeal denied 304 N. Y. 987.)

Plaintiffs who are statutory tenants in possession have not yet been subjected to any proceedings under the rent control laws and the rent regulations (§ 55, subd. 3). This court should not be called upon to review the acts of the rent commission not yet undertaken or decided. The procedural remedies available to statutory tenants under the rent control laws are open and all claims of fraud, illegality and misrepresentation designed to secure the unlawful eviction of these statutory tenants may be raised when, as and if an application is made by the owners of proprietary leases to obtain a certificate of eviction from the State Rent Administrator. There plaintiffs may secure full relief to which they may be entitled.

In view of the fact that plaintiffs have an adequate remedy at law, the trial court properly dismissed their amended complaint after the close of their case. The judgment should be affirmed.

BREITEL and BASTOW, JJ., concur with BOTEIN, J.; COHN, J. P., dissents and votes to affirm, in opinion in which BERGAN, J., concurs.

Judgment reversed and a new trial ordered in accordance with the opinion herein, with costs to the appellants to abide the event.