Thomas A. Aurelio, J.
This has been a long, protracted, and bitterly contested trial. The record is encumbered with endless discussions and heated arguments. The action is for a judgment to declare invalid and illegal the co-operative apartment plan sponsored by the four individual defendants, who are the sole stockholders of the corporate defendant, 1178 Madison Avenue Corp., owner of the multiple dwelling building at 930 Fifth Avenue, this city, and for injunctive relief. The two attorneys appearing for the plaintiffs, one pro se and the other on behalf of tenants, are themselves tenants of the building and vigorously oppose the plan as presented.
*698 The plan is attacked on various grounds, primarily on the grounds:
(a) the price demanded for the apartments is exorbitant and too high and constitutes profiteering and is in direct violation of the true intent and spirit of the rent laws enacted by the Legislature for the protection of statutory tenants during the housing shortage which still continues;
(b) it is-fraudulent in many respects;
(c) the sponsors did not obtain the subscriptions of the minimum of 35% of statutory tenants required by the rent regulations; and
(d) the plan is a sham and device to circumvent the rent laws as it does not include provisions for essential elements of true co-operative ownership.
While the rent laws make no provision for co-operative apartments, they do authorize the Bent Administrator to promulgate regulations in connection with increases in rent and evictions. Pursuant to such power, the Bent Administrator has promulgated Amendment 39, effective June 30, 1955 (amdg. State Bent & Eviction Begulations, § 55, subd. 3, par. [c]) which provides the method by which owners of co-operative apartments may obtain a certificate of eviction. The co-operative plan presented by defendants is claimed to be in compliance therewith.
The property is located at the northeast corner of 74th Street and Fifth Avenue, one of the finest residential sections in mid-Manhattan. The building, 18 stories high, contains 139 apartments, 5 doctors’ offices, 626 rooms, 241 baths, 4 penthouses and 12 rentable maids’ rooms.
The list price to all tenants amounts to $3,537,459. The decontrolled tenants’ apartments amount to $408,924, leaving a list price of $3,128,535 to the controlled tenants and, deducting therefrom the discount of 25% the sponsors finally allowed them, they will be required to pay the sum of $2,346,398 which, added to the decontrolled tenants’ amount of $408,924, makes a total of $2,755,322 over and above the mortgage of $3,000,000 as the plan is now presented. The plan also provides that the sponsors will provide the co-operative corporation with a working capital of $235,000. Thus the sellers will receive for the building $5,520,322, which is $1,820,322 over and above the price they paid for it.
The building was purchased in January, 1957, by defendant 1178 Madison Avenue Corp. from Uris Brothers for the sum of $3,700,000, subject to a first mortgage of approximately $1,700,000, The annual rental income at the time was about *699 $454,653. After the purchase of the property the owner (1178 Madison Avenue Oorp.) applied for and obtained a rent increase from the Temporary State Housing Bent Commission, which, together with the further increase for an expenditure of $48,000 for the installation of additional electric current and increased rent received from apartments that were decontrolled by subdivision 18 of section 9 of the State Bent and Eviction Begulations of the Bent Commission, the total rental income was about $550,640, in December, 1958. Thereafter, defendant 1178 Madison Avenue Corp. applied for and obtained from the Mutual Benefit Life Insurance Company of Newark, New Jersey, a commitment for a mortgage in the sum of $3,000,000 to replace the existing mortgage of $1,700,000 held by Prudential Life Insurance Company upon certain conditions which since have been fulfilled to the satisfaction of the company. The amended complaint alleges that the mortgage resulted from a conspiracy entered into by defendants with the Mutual Benefit Life Insurance Company. Mr. Smith, a vice-president of the Insurance company, testified that the loan was made on a 66%% basis upon an appraisal of $4,500,000 made by him and his associates in the insurance company after investigation. Plaintiffs’ own expert, one Mr. Siegel, testified that it would cost about $2,400,000 to reproduce a comparable building today, and that the land was worth $1,800,000, making a total of $4,200,000. The record is devoid of any credible competent evidence to support a charge of conspiracy. I am satisfied the mortgage is sound.
The charge that Lester Backner, a reputable member of the Bar, conspired with defendants to help them to obtain the mortgage commitment of $3,000,000 by signing a lease at a rental higher than he actually paid, is baseless. His explanation is a plausible one, and, moreover, in considering the rent roll the insurance company was informed about this arrangement. It did not affect the mortgage transaction and no one was prejudiced thereby.
Much too much has been made of the Milton Jacobson incident. Having been the first one to call the tenants together for the purpose of organizing and acting together in considering the co-operative plan which was about to be submitted and after obtaining from the sponsors some concessions as a result thereof, he evidently concluded nothing more could be accomplished and thereupon subscribed to the plan and recommended it to the tenants, although there were many still opposed to it because they felt the price still was too high. Plaintiffs’ counsel have termed Jacobson’s failure to continue to “hold the line” a *700 betrayal of the tenants’ committee, of which he then was chairman.
The record does not sustain this charge. Moreover, there is no evidence in the case that any tenant was induced to subscribe to the plan as the result of any deception practiced upon him by Jacobson. It is important to note there were many shades of opinion. Some were desirous of buying; some were in doubt; and still others who did not want to buy at all. To to sure, all felt the price was too high. In any event, concessions were obtained from the sponsors. As first presented, the plan provided that the sponsors agreed (a) to allow statutory tenants a discount of 20% from the list price of their respective apartments, (b) to contribute $45,150 for estimated repairs to the building, and (c) to provide the corporation with working capital of $50,000 in cash. As a result of negotiations that went on between the tenants’ committee and the sponsors, the plan was amended and modified (a) to increase the statutory tenants’ discount from 20 to 25%, and (b) the working capital was finally increased to $235,000. At this point the sponsors refused to make further concessions. Jacobson, believing this to be final, subscribed to the plan and recommended that the tenants accept it even though he had been replaced by another committee headed by Leon Freehtel. It does not appear that Jacobson had pledged himself not to subscribe to the plan under any circumstances or unless the committee approved it. How, then, can it be said that he betrayed the tenants? I fail to see it that way. Nor do I attach any sinister significance to Jacobson’s expression of interest in a co-operative plan and that he “ would work ” for the plan as noted under date of October 30, 1958 in a book (referred to as the “ black book ”) kept by the witness Hubbard who had charge of the building, he being a vice-president of Brett, Wyckoff, Hamilton, Potter, Inc., real estate brokers and agents of the building through whom the plan was presented.
Both sides have cited and rely upon the cases of Judson v. Frankel (279 App. Div. 372); Matter of Hoenig v. McGoldrick (281 App. Div. 663); People ex rel. McGoldrick v. Sterling (283 App. Div. 88); Gilligan v. Tishman Realty & Constr. Co. (283 App. Div. 157, affd. 306 N. Y. 974); Barbee v. 2639 Corp. (284 App. Div. 298) and Golenpaul v. Frankel (285 App. Div. 941).
In the case of Matter of Hoenig v. McGoldrick (supra, p. 664) the court said: “ The courts cannot insert into the statute or regulations a requirement that the valuation of real property shall be controlled for the purposes of plans for co-operative apartments. The only relevance which the absence of such a *701 provision in the regulations has, concerns whether these regulations are a valid exercise of the power conferred upon the Bent Commission by the Legislature.”
In deciding Gilligan v. Tishman Realty & Constr. Co. (supra, pp. 159-160) the court pointed out: “ There is little doubt that Bealty bought the building with the purpose in mind of organizing a co-operative corporation and selling the building to it at a substantial profit. Plans for launching an elaborate campaign to turn the building into a co-operative one were initiated immediately after Bealty took title. This profit-making objective, in and of itself, is not illegal (Matter of Hoenig v. McGoldrich, 281 App. Div. 663); and it does not appear that the amount which Bealty fixed as the sale price of any of the seventy-two apartments in the building was unfair or discriminatory. The emergency rent statutes and implementing regulations do not proscribe the profit motive — provided its unrestrained exercise does not result in ‘ exactions of unjust, unreasonable and oppressive rents and rental agreements. ’ (Declaration and findings, State Besidential Bent Law [§ 1, subd. 1; L. 1946, ch. 274, as amd.].) ”
All these cases were decided before Amendment 39 was promulgated and were considered by the Bent Administrator, yet there is no provision in the amendment controlling the profit that may be made or which requires the Bent Administrator to approve the valuation of the property before the plan can become effective. Nor has the Legislature acted thereon.
In contrast it should be noted that rental increases for controlled apartments can only be obtained upon a showing that “ (1) the rental income from a property yields a net annual return of less than six per centum of the valuation of the property. Such valuation shall be the current assessed valuation established by a city [or] town ” plus “ an allowance for depreciation of two per centum of the value of the buildings, exclusive of the land” (State Besidential Bent Law, § 4, subd. 4, par. [a]). No such limitation is placed upon value for a co-operative plan.
In promulgating Amendment No. 39 to the State Bent and Eviction Begulations which became effective June 30, 1955, the State Bent Administrator in his “ Statement of Considerations for the Issuance of Amendment No. 39 to the Bent and Eviction Begulations ”, had this to say (pp. 4-7):
In February 1955 the Administrator ordered a survey of higher rental dwelling units to ascertain, among other things, the extent to which apartment units had been converted into cooperatives. The areas surveyed included *702 census tracts in Manhattan, Forest Hills and Brooklyn Heights. The great majority of higher rental apartments were found in mid-Manhattan along Park, Madison and Fifth Avenues. Of 131 buildings sampled in which rents were $200 monthly or more, 47 or more than one-third were now cooperatively owned, suggesting the large volume of such transactions.
• • •
While many cooperative transactions have been fairly undertaken and some have proved very profitable to the tenant purchasers, some have been promoted by questionable practices. These have included private agreements by promoters to repurchase stock from selected tenants who prime the deal; fictitious sales to dummies; threats to resisting tenants, i.e. “that the family would be sleeping in Central Park unless,” etc.; misrepresentations as to the landlord’s punitive powers under the rent laws; daily visitations to .the apartment that make living unbearable; purchase of apartments from a statutory tenant with a private agreement to repurchase at a profit if the statutory tenant would purchase another apartment at list price; payment of bonuses to tenants in return for voluntary removal so that the vacated apartment may then be sold; misleading newspaper releases announcing sale of the house to a tenant group which is presumably ready to evict the remaining occupants on three months’ notice. Misrepresentation as to. the number of tenants who have purchased, have created fears that the 80% figure has been or is being reached prompting the remaining tenants to rush in under the deadline.
* * *
The line between the tolerable tactics of the salesman in search of the buyer and the intolerable chicane of the unscrupulous in search of the windfall is not easy to draw. Giving “ impulse ” to cooperation is legitimate even when the cooperative spirit is generated by highlighting fair interpretations of the rent law and its consequences for the unyielding tenant * 6 * “there is small likelihood of any cooperative plan springing spontaneously” from tenants content with their tenant status. Threats, secret premiums and material misrepresentations, however, exceed the bounds of fairness.
* * *
There is no opposition to cooperatives as such, but there is widespread agreement as to the need for checking some of the less scrupulous practices. This would carry out the law’s intent to curb “unjust, unreasonable and oppressive rents and rental agreements” to “forestall profiteering, speculation and other disruptive practices” and “to prevent uncertainty, hardship and dislocation.”
• * •
Whether the recent spurt in cooperatives has been due to the new rule, to the sudden demand for high rental apartments precipitated by the influx from the West to the East side, to tales of profits made by tenants who had bought, to the epidemic nature of real estate operations generally, or a combination of these factors cannot be determined.
e * e
Moreover, considerable financial advantages may accrue to cooperators from a fair venture, and this may be the primary motivation for converting tenure from tenancy to cooperation. If the terms of sale are reasonable, monthly charges may be less than rent. To persons in a high income bracket there may be substantial tax advantages where the Federal Government affords a deduction for interest and taxes — advantages not accruing to ordinary tenants. *703 Some tenants envision the possibility of future decontrol of apartments in the higher rental brackets. In still other cases, landlords have been able to secure statutory increases or applied for certificates of eviction in order to alter apartments or demolish them. Still other tenants wish to make extensive improvements which they might not be justified in making as statutory tenants.
These are fears and considerations which should be respected by an Administrator operating under a temporary law subject to lapse at the end of stated periods or subject to legislative modifications favoring the landlord. Where such risks are present and if fair and voluntary arrangements can be made against them, they should not be disturbed.
The Administrator’s main problem, therefore, gets down to so amending the Regulations as to prevent improper pressures and build a lawful environment within which cooperative contract can function. * * *.
The Administrator believes that if a cooperative offers sufficiently attractive benefits to the tenants, at least 35 percent will agree to purchase either under the plan as presented or as modified within the six-month period. * * *
The six-month period is designed to afford a sufficient period within which the landlord can negotiate with tenants and the tenants weigh the offer and make counter-offers, confer with other tenants, secure counsel and make their decisions. * * * In computing the 35 percent, apartments vacant when the plan is presented or vacated thereafter will not be counted except when purchased by another tenant in occupancy for his personal use. This aims to discourage operators from harassing non-cooperating tenants. * * *
The requirement that 80 percent of the apartments be occupied by tenant-owners is retained. This should enable the cooperative purchasers to seek the benefits of tax exemption. No immediate application can be made for eviction of a non-purchasing tenant unless the 80 percent figure has been reached. The two year rule allowing a purchasing tenant to evict the tenant in occupancy after two years is also retained, but this will not be operative unless 35 percent of the tenants have purchased.
None of the vices pointed out by the Rent Administrator in the foregoing statement have been established by a fair preponderance of the credible evidence in the case at bar although their existence was claimed by plaintiffs.
An indicated, among other things, Amendment 39, effective June 30,1955, promulgated by the Rent Administrator, provides that before the plan can be declared effective it must be shown that 35% of the controlled tenants in possession on the date the plan is presented have agreed to purchase their apartments or other vacant apartments without fraud or duress and with no discriminatory inducement.
Based on the holdings in the cited cases, and upon the Rent Administrator’s Statement of Considerations for Issuance of Amendment No. 39 to the Rent and Eviction Regulations, I have reached the conclusion that the element of profit, substantial though it be, does not, in and of itself, render the plan invalid or illegal.
It is apparent that sales of apartments in a building that is being co-operated produce a higher sales price for the premises *704 than a sale thereof on a non-co-operative basis would bring.
I am not satisfied, as plaintiffs claim, that in fixing the prices for the apartment there was any discrimination or that it was not fairly arrived at by a consideration of the number of rooms, layouts, baths, kind of exposures, the floor the apartment is on, and other features which render an apartment more desirable and more valuable than another. Also, the plan sets forth in detail what a purchaser would get and what to expect and what is based on estimates. With all the tenants’ meetings held, all the attacks made on the plan, all the information and advice, legal and otherwise, passed around to the tenants, it is difficult to understand how any purchaser could have been misled or deceived by anyone. I am convinced that those who purchased did so with eyes wide open.
Considerable testimony was given with respect to the physical condition of the building. After the plan was presented a tenants’ meeting authorized the engagement of a consulting engineer to make a physical inspection of the building and to report thereon. A report was submitted and the contents thereof made known to the tenants with the cost required to remedy the claimed defects. Nevertheless, a number of tenants chose to subscribe to the plan which, of course, they were free to do. The decision was of their own making. Under such circumstances, it cannot be said they were misled.
On the question of price, Malcolm Kingsberg, one of the plaintiffs, testified: “If this were not controlled this apartment would probably be in line, in my opinion, with what you pay for new apartments but I think that the law has seen fit to give us tenants who live in controlled apartments the right to get part of the windfall that has come about by the increase in the cost of real estate; the tenant gets part of it apparently and the landlord gets part of it. But here the landlord comes in and . he wants all of it. The price, in my opinion, that this apartment is being offered to the tenants at is fully as high as if this had been a new building. In other words, if you could build this building today, replace it and offer it to the tenants at the price it is being offered, and still show a profit to the builder ” [sic].
It should be noted that the tenants were insistent upon a 50% discount from the list price to the controlled tenants. Incidentally, it is because Jacobson did not press vigorously for a 50% discount that the plaintiffs and some other tenants rebelled against him and organized a new tenants’ committee.
Thus it becomes apparent that the opponents of the plan wanted “to get part of the windfall that.has come about by *705 the increase in the cost of real estate ’ ’ as testified to by-Mr. Kingsberg.
Some tenants who subscribed to the plan testified that they felt the price was too high and that they had made comparisons with other co-operatives but could not do better.
The record satisfactorily establishes that the co-operative plan with two lists of subscribers as filed with the rent commission on March 23, 1959, one of which was incorrect, with 47 names, and a corrected list with 49 names, was a sufficient compliance with the requirements of section 55 (subd. 3, par. [c]) of the Bent Eegulations. How many, if any, received the incorrect list (47 names) is not established. In any event, a correct list was sent to all the tenants within 24 hours and no one was prejudiced thereby.
It is the claim of the plaintiffs (Harvey M. Lewin’s Brief After Trial, p. 11) that only 41 apartments of statutory tenants validly subscribed, ‘ ‘ which is less than the required 45 apartments in order to constitute the 35% under the Eegulations.”
I find and decide for the purpose of computing the 35% required by section 55 before the plan may be declared effective that on March 23, 1959, when the plan was declared effective, there were 127 controlled apartments. Thirty-five percent of this number equals 44.45 apartments. Plaintiffs, however, question 8 of the 49 apartments listed as subscribers on the effective date. With respect to the three Star apartments, I believe apartment 8B (Miss Breen) should be counted, and apartments 3A and 2G eliminated. The other five, Kaplan, Waxberg, Divine, Friedman, and Mrs. Altheimer I find are valid and should be counted. This makes 47 valid subscriptions and constitutes 37% of the controlled apartments, or 2% more than required.
The Kaplan lease, in the name of Mr. Kaplan, provides the apartment (7C) may be occupied by him and “ members of Ms immediate family ”. The purchase of this apartment by Mr. Kaplan for his daughter and son-in-law, both of whom reside in the apartment, therefore constitutes a purchase by “ a tenant in occupancy ” as required by subdivision 3 of section 55 of the Bent and Eviction Eegulations.
Apartment 8B, one of the questioned Star apartments, was purchased by Miss Breen, niece of Mr. Star, with money advanced by C. V. Star & Co., for which Miss Breen gave Mr. Star her promissory notes to repay Mm for it. She has occupied this apartment for over 11 years and during 6 months of the year her mother lives with her. In the circumstances, there is no good reason why this apartment should not be counted. Plaintiffs’ claim that the sponsors would not accept the pur *706 chase by -Mr. Star of the decontrolled Penthouse C unless the other three statutory apartments controlled by Mr. Star were also purchased is not supported by the credible evidence. This claim is based on guess, surmise, and suspicion and it is rejected.
With respect to the Waxberg, Divine, and Mrs. Altheimer apartments, it appears that they did not purchase the controlled apartment in which each lived. Each of the tenants preferred one of the vacant apartments, which they purchased. This, plaintiffs claim, constitutes “ discriminatory inducements There is no evidence in the case that they were given preferential treatment over some other tenant. No tenant has made such a claim nor is there any evidence that another tenant was denied the equal right to make such purchase. Moreover, the Bent Begulations (§ 55, subd. 3, par. [c], cl. [i]) provide that in computing the 35% a vacant apartment “ purchased for personal occupancy by a tenant of a controlled housing accommodation ’ ’ may be included.
The claim that Mr. Leonard Friedman’s alleged commitment to the plan sometime prior to its presentation to the tenants renders it invalid is without merit. No authority for such a holding has been cited to the court.
The other points made by plaintiffs which I have not discussed have been considered and found to be without merit, and, in any event, are not satisfactorily established to affect the result arrived at herein.
Upon the entire record before me, I find and decide that the plan incorporates the essential provisions necessary for co-operative ownership of apartments and that the plan is valid and legal and complies in all respects with the requirements of the rent laws and the regulations promulgated thereunder.
I also find and decide that plaintiffs have failed to establish by a fair preponderance of the credible evidence their right to the relief sought herein.
Accordingly, judgment is rendered in favor of the defendants, with costs. Defendants’ application for an extra allowance pursuant to section 1513 of the Civil Practice Act is denied.
The foregoing constitutes the decision of the court required by section 440 of the Civil Practice Act. The exhibits are with the Clerk of the court and each party may obtain his own from him.