Jacob Markowitz, J.
Plaintiffs are tenants of apartments in 360 East 72nd Street, New York, New York. They bring this action for a declaratory judgment that a plan under which the building has become a co-operative was in violation of the Bent Stabilization Law of 1969 and therefore null and void, and for incidental relief.
The action is against the sponsor of the plan (estate of Alfred L. Kaskel), the co-operative corporation (360 E. 72nd Street Owners Incorporated), the Administrator of the New York City Housing and Development Administration, and the Beal Estate Industry Stabilization Association of New York City, Inc.
The co-operative corporation has amended its answer to include a cross claim against the sponsor, the former owner of the building. In turn, the sponsor has moved to dismiss the cross claim on the grounds that it may not properly be interposed in this action, and that it fails to state a cause of action.
Six holdover summary proceedings, originally brought in the Civil Court of the City of New York by holders of proprietary leases against the occupants of the apartments involved, were removed to this court and consolidated for trial with the basic action. The answers in the summary proceedings raise the defense that the plan to convert the building to co-operative ownership was not validly declared effective under the Bent Stabilization Law. The parties to the summary proceedings have stipulated that the petitioners have proven a prima facie *437 case. Hence, the dispositive issue in the summary proceedings is also whether the co-operative plan was, or was not, in violation of the Rent Stabilization Law.
The original plan is dated October 31,1969. It was presented to the tenants beginning November 5, 1969. It was twice amended and then declared effective by the sponsor as of November 17, 1970. On March 12, 1971, the Attorney-General ruled that the sponsor had improperly included duplicate purchases in computing whether it had reached the necessary 35% of tenant occupants who had agreed to purchase dwelling units. The Attorney-General directed that sales be suspended pending acceptance for filing of an amendment negating the premature declaration of effectiveness and offering to rescind all agreements executed on or after November 17, 1970. The sponsor complied with this directive.
The plan was again declared effective on or about May 4, 1971, as of April 20, 1971, under an amendment accepted for filing by the Attorney-General. The co-operative corporation took title on May 27, 1971.
The building is a Class A multiple dwelling subject to the Rent Stabilization Law of 1969 (Administrative Code of the City of New York, tit. YY). It has 454 residential apartments. When the plan was presented in November of 1969, there were 11 vacancies — 35% of the 443 occupied apartments amounts to 155.05.
Section YY51-6.0 of the Administrative Code deals with the Real Estate Industry Stabilization Association and the code to be adopted by the association. Paragraph (9) of subdivision c of this section provides that an owner shall not refuse to renew a tenant’s lease except where he intends to demolish the building, or he has submitted to and the Attorney-General has accepted for filing a plan to convert the building to co-operative or condominium ownership. The owner must present the offering plan to the tenants in occupancy, and must also file a copy of the plan with the Housing and Development Administration.
The subdivision sets out a series of mandatory provisions in any such plan (par. [9], subpars. [a] — [f]). Pertinent to present purposes are subparagraphs (a) and (b) reading: “ (a) the plan will not be declared effective unless and until thirty-five per cent of the tenants then in occupancy have agreed to purchase dwelling units or the stock entitling them to proprietary leases for such dwelling units with no discriminatory repurchase agreement or other discriminatory inducement; (b) the tenants in occupancy at the time of the offering shall have *438 the exclusive right to purchase their dwelling units or the shares allocated thereto for ninety days after the offering, during which time a tenant’s dwelling unit shall not be shown to a third party unless he has, in writing waived his right to purchase ”.
T construe the words “ then in occupancy ” in subparagraph (a) to mean in occupancy at the time the plan is declared effective (see Kovarsky v. Housing and Development Administration, N. Y. L. J., Feb. 26, 1971, p. 19, col. 3, affd. 37 A D 2d 917).
On April 20, 1971, there were 48 vacancies (Exh. H; cf. Exh. 44, par. 3, stating that there were 51 vacancies on that date) — 35% of the 406 tenants “ then in occupancy ” amounts to 142.10.
Exhibit 5 lists 165 claimed qualifying purchasers as of April 20, 1971. Of these, 6 purchasers did not consummate their purchases, 11 bought apartments vacant on April 20, 1971, and 12 others were not in occupancy on that day of the apartments they purchased.
Thus, 23 of the listed qualifying purchasers were not in occupancy of the purchased apartments of April 20, 1971. On the other hand, 13 of the purchasers not in occupancy of the apartments they bought were occupants of other apartments in the building. My reading of the local law is that occupancy of any apartment in the building was sufficient to comply with the quoted provision of the Bent Stabilization Law (Administrative Code, YY51-6.0, subd. c, par. [9], subpar. [a]). This leaves 10 apartments purchased by nonresidents and 6 unconsummated transactions — a total of 16. Hence, at least 149 purchasers qualified as “ tenants in occupancy ” as against the .required 142.10, so that, absent other invalidity in the implementation of the plan, it qualified under the law and may not be upset (see Schumann v. 250 Tenants Corp., 65 Misc 2d 253).
Plaintiffs argue that resident purchasers of apartments other than their own may not be counted when computing the 35% needed to declare the plan effective (Code of Beal Estate Industry Stabilization Association of New York City, Inc., § 61 [4(a)]). The code bears some evidence to the contrary (Code, § 61 [4(a), (ii) (iii) (iv)]). If, however, the code provision that for the plan to be declared effective 35% of the tenants then in occupancy must ‘6 have agreed to purchase their dwelling units” (italics supplied), is to be read as urged by plaintiffs, it is inconsistent with the Bent Stabilization Law and consequently inoperative (8200 Realty Corp. v. Lindsay, 27 N Y 2d 124, 129-139, 132; Major v. Waverly & Ogden, 7 N Y 2d 332, 336; Matter of Picone v. Commissioner of Licenses, 241 *439 N. Y. 157; Schumer v. Caplin, 241 N. Y. 346, 350-351; Tropp v. Knickerbocker Vil., 205 Misc. 200, 211-212, affd. 284 App. Div. 935).
The Rent Stabilization Law permits the plan to be declared effective when 35% “ of the tenants then in occupancy have agreed to purchase dwelling units ”. It does not require that these tenants purchase their own dwelling units. The word “ their ” was added by the code. If the addition is deemed to delimit the local law, it is legislative in character and impermissible (8200 Realty Corp. v. Lindsay, supra, p. 132; Tropp v. Knickerbocker Vil., supra, pp. 211-212).
We reach more troublesome problems, to be adjudicated in the light of applicable legal rules gradually crystalizing as more of cases of this character come before the courts (8200 Realty Corp. v. Lindsay, 27 N Y 2d 124, supra; Coolidge v. Kaskel, 16 N Y 2d 559; Northridge Cooperative Section No. 1 v. 32nd Ave. Constr. Corp., 2 N Y 2d 514, 523, 526-528, 530-531; Shore Terrace Cooperative v. Roche, 25 A D 2d 666; Northridge Cooperative Section No. 1 v. 32nd Ave. Constr. Corp., 10 A D 2d 244, affd. 9 N Y 2d 818; Schumann v. 250 Tenants Corp., 65 Misc 2d 253; Gantzhorn v. Yorkville House Co., N. Y. L. J., Oct. 13, 1971, p. 2, col. 4, affd. 38 A D 2d 691; see, also, General Business Law, § 352-e).
The Martin Act (General Business Law, art. 23-A) has not curtailed this court’s inherent jurisdiction “ in law and equity to deal with allegations of fraud, deceit, misrepresentation and breach of fiduciary obligations, irrespective of the statutory requirements ” (Schumann v. 250 Tenants Corp., supra, p. 257). On the other hand, “ the fact that the plan was accepted is an administrative determination of [its] sufficiency which is to be given great weight by any reviewing court ” (p. 259).
Plaintiffs point to the provision in the original plan calling for purchases by 35% of the tenants in occupancy at the date of the presentation of the plan to make the plan effective, and argue that this percentage of the tenants then in occupancy did not buy shares in the co-operative corporation. The difficulty with this position is that plaintiffs’ rights do not flow from the plan. They flow from the Rent Stabilization Law and the code. These call for the purchase of dwelling units by 35% of tenants in occupancy when the plan is declared effective, not when it was presented.
With this statutory requirement the sponsor did comply, assuming the absence of fraud, coercive device, or discrimina *440 tory repurchase agreements or other discriminatory inducements given those included in the computation of the 35%.
Plaintiffs also point to the provisions of subdivision 4(a) of section 61 of the code specifying that the base for computing the required 35% shall be all residential apartments in the building other than those vacant and not under lease when the plan was presented. As already indicated, 11 of the 454 apartments in the building were vacant when the plan under study was presented.
Under this formulation, 155.05 purchases were called for. By the same section, however (as under the Bent Stabilization Law), consummated purchases are not the criterion. A plan becomes effective when 35% “of the tenants then in occupancy have agreed to purchase ” dwelling units. On this basis, 155 tenants qualified as purchasers, as against the needed 155.05.
I am not prepared to upset the ruling of the Attorney-General accepting the sponsor’s declaration that the plan had become effective because of the lack of .05 per cent (see Schumann v. 250 Tenants Corp., 65 Misc 2d 253, supra). I consider the difference de minimis.
We confront, therefore, whether the practices complained of by plaintiffs violated the Bent Stabilization Law.
Without question, the sponsor could properly institute, procedures to turn the building to co-operative ownership. Equally, indisputably, profit motivations, and fair sales techniques within the law, did not impair the implementation of this objective. “ But by the same token the defendants must comply substantially with the requirements of statute and regulation, at the risk of otherwise forfeiting their rights ” to declare the plan effective (Gilligan v. Tishman Realty & Constr. Co., 283 App. Div. 157, 160, affd. 306 N. Y. 974).
The determinative issue is whether the subject plan or its implementation “was so permeated with fraud or illegality in its conception, inception or early presentation as to wárrant a declaration that the plan itself is illegal ” (Gilligan v. Tishman Realty & Constr. Co., supra, p. 161; see, also, People ex rel. McGoldrick v. Sterling, 283 App. Div. 88).
The original offering price of the building to the co-operative corporation, in November of 1969, was somewhat less than $26,000,000. For lack of sales, the price was reduced, in May of 1970, by the first amendment of the plan, to $23,507,200. In addition, tenants in occupancy were offered three inducements to buy shares:
*441 1) The exclusive right for 90 days to buy shares for cash at a discount of 30% from the list price.
2) To finance purchases through the sponsor of up to 50% of the cash sales price over a period of seven years, at 71/2%, under a self-liquidating plan, at a discount of 20% from the list price.
3) Reduction of the required down payment from 10% of the purchase price to $1.00 a share.
Still the shares did not sell.
In August of 1970, a second amendment was promulgated. The 30% discount for cash purchases was continued for another 90 days. The proposed financing plan was improved, for the additional period, so that a tenant in occupancy could finance up to 75% of the cash sales price and receive a discount of 25%. In addition, in respect of any purchase agreement by a tenant in occupancy within the 90-day period, the sponsor promised to cause the shares to be repurchased within two years after title passed to the co-operative corporation, provided the purchaser surrendered his apartment.
If the option to sell was exercised within seven months of the closing, the resale price was the full list price; if after seven months from the closing, the resale price was the amount paid for the shares by the tenant.
Finally, the sponsor promised to pay any increase, during the first two years following the closing, in the expenses of the co-operative corporation over the amounts estimated.
Since these inducements were offered publicly, and to all tenants in occupancy, they may not be held to constitute discriminatory inducements (Northridge Coop., Section No. 1 v. 32nd Ave. Constr. Corp., 10 A D 2d 244, 249, affd. 9 N Y 2d 818; 2 N Y 2d 514, affg. 286 App. Div. 422; Schumann v. 250 Tenants Corp., 65 Misc 2d 253, 264, supra). Moreover, I see nothing inherently wrong with the progressive gestures to “sweeten the pot ” to attract purchasers. This, in itself, is not contrary to stabilization policy.
The second 90-day period expired on November 10, 1970. By that date only 83 tenants had bought shares.
An all-out effort was thereupon put under way by the sponsor to get the requisite number of agreements. Within seven days thereafter, the sponsor decided that he had the necessary number of agreements.
As noted, the plan was declared effective by the sponsor on November 17, 1970, but the Attorney-General refused to accept the declaration to that effect. After hearings, he ruled (on *442 March 12, 1971) that the sponsor had failed in its objective and that the declaration of effectiveness was premature. Also, as noted, the Attorney-General directed that all offerings and sales be suspended pending acceptance by his office of an amendment disclosing that the declaration of effectiveness was without effect and ‘ ‘ making an offer of rescission of all agreements executed on or after November 17, 1970 ”.
While referring to the claims by tenants that coercive efforts had been utilized to obtain some of the purchase agreements made just prior to November 17,1970, the Attorney-General did not pass on these claims, leaving open the problem of improper acts prior to that date.
By a third amendment to the plan, dated March 22, 1971, the sponsor complied with the Attorney-General’s directive. In line with the Attorney-General’s directive, it gave the tenants the right to rescind purchase agreements executed after November 17, 1970. Moreover, it gave tenants in occupancy on November 5, 1969 (when the plan was promulgated), 30 more days to buy shares for cash at a 25% discount or under the 75% self-liquidation loan program, but with a discount of 20%.
A little more than a month later, on April 27, 1971, the sponsor again declared the plan effective. The amendment to that effect was accepted for filing by the Attorney-General, on May 4, 1971.
To vitiate the plan, plaintiffs rely on the sales made on November 11 and 12 of 1970, based on statements made by the sponsor that the plan had gone “ over the top ”. I give credence to the testimony of several witnesses that beginning November 10, 1970, it was so represented by the sponsor’s representatives. If the sales on November 11 and 12 were the result of this representation, and it was without basis, they should be excluded from the count for the purposes of the Rent Stabilization Law (Gilligan v. Tishman Realty & Contr. Co., 283 App. Div. 157, 161-163, supra).
Once the word was passed that the requisite 35% had signed up, other tenants, to protect their homes, inevitably joined the buyers. If the representation was inaccurate,, and knowingly made, it was a form of economic duress (see Austin Instrument v. Loral Corp., 29 N Y 2d 124, 130-131), with repercussions which may very well have permeated the program in its entirety, but which, at the very least, seriously and adversely affected the rights of the tenants who did not buy, the plaintiffs in this action.
*443 Botein, J.
(thereafter P. J.) put it well in Gilligan v. Tishman Realty & Constr. Co. (283 App. Div. 157, 162-163, supra) :
“ Obviously, the most obsessing fear of a tenant confronted with a co-operative proposal, and the most paralyzing weapon in the arsenal of the promoter, is the possibility that 80% [here 35 %] of the tenants will purchase stock and that immediate application will be made for the eviction of the nonpurchasing tenants. In a tight rental market, when it is most difficult to obtain comparable dwelling space, tenants check the sales to their cotenants; and if they feel that substantial progress is being made toward procuring the dreaded 80% [here 35% ], many will perforce capitulate.
“ The incidence of these eight repurchase agreements is more significant than their mere arithmetic ratio to the seventy-two apartments in the building. As of June 25, 1951, almost a month after the outside date originally given by Realty to the tenants to make their decisions, only sixteen apartments had been sold. * * * It may be that the repurchase agreements represented a device to stampede the entrenched tenants into acceptance of the plan.”
The picture before me is phenomenally similar. The subject plan was promulgated on November 5, 1969. As noted, over a year later, on November 10, 1970, despite repurchase and other inducements offered the tenants, only 83 tenants (out of approximately 142 to 156 needed) deemed the benefits sufficiently attractive to execute purchase agreements. On November 10 and 11, 1970, statements were nevertheless made by the sponsor in the lobby of the building and elsewhere that an adequate number of tenants had purchased shares to make the plan effective; and a champagne party was scheduled for November 12. No wonder then that on November 11 and 12 of 1970, 47 agreements were signed unconditionally by tenants and two additional agreements were made by tenants subject to later confirmation. Bight of these thereafter resold their shares to the sponsor.*
Actually, the plan had not gone “ over the top ” on November 10,1970; even with the additional agreements the requisite number was not reached — as thereafter officially found by the Attorney-General.
The damage was not repaired by the order of the Attorney-General permitting rescission of the agreements made after *444 November 17, 1970. The parties to the 49 agreements made on November 11 and 12 were not granted the right of recission. Absent recission, the covered tenants were bound by the agreements; to rescind, they would have had to institute expensive suit or exercise their rights under the buy-back agreement and move out of the building.
For present purposes, we need not decide precisely the number of tenants who bought shares because of this conduct; nor need we decide precisely which of these tenants would have bought shares in any event. Whatever the precise number, I am convinced that, while the plan may be binding on those who purchased shares, sufficient of the purchasing tenants did succumb to the sponsor’s pressure to subvert the provisions of the Bent Stabilization Law. Techniques had been used by the sponsor beyond permissible salesman’s puffing.
Accordingly, the agreements of November 11 and 12, 1970, tainted the declaration of effectiveness of April 20, 1971, making section YY51-6.0 (subd. c, par. [9], subpar. [a]) of the Administrative Code inapplicable to the nonpurchasing tenants in occupancy of their apartments on November 5, 1969. Plaintiffs are entitled to judgment so declaring.
In fashioning relief, we deal only with the rights of the non-purchasing tenants under the Bent Stabilization Law; except as the plan affects the local law, the validity or invalidity of the plan, qua plan, need not be adjudicated (see Matter of Ortega v. Lefkowitz, 66 Misc 2d 438, affd. 38 A D 2d 792).
Those who participated in the plan and the co-operative corporation stand in a different posture. The building was not rent-controlled prior to the adoption of the Bent Stabilization Law of 1969; until its adoption, tenants of the building were entitled only to possessory and other rights given them by contract or lease, oral or written, within the scope of general landlord and tenant law. With its adoption there were added the limited additional rights granted by the local law. Until they agreed to purchase shares under the co-operative plan, its provisions did not expand, or contract, these rights. When they did, their rights were governed by other rules of law.
On the other hand, nonpurchasing tenants are entitled to the possessory rights granted them by contract and those added by the Bent Stabilization Law and the code adopted thereunder. The provisions of the co-operative plan as such did not enlarge or diminish these rights.
Judgment may be entered directing the co-operative corporation, as present owner of the building, to enter into leases *445 with each of the nonpurchasing tenants entitled thereto and so demanding, granting him his present rights under the Bent Stabilization Law (Administrative Code of City of New York, § YY51-1.0 et seq). Existing proprietary leases are declared subject to the rights of nonpurchasing tenants in occupancy on November 5, 1969 who have not vacated their apartments since that date. Proprietary lessors shall be entitled to receive the rents payable by such tenants. The summary proceedings before the court are dismissed, without costs, and without prejudice to renew on grounds not inconsistent with this decision.
There remains for disposition the cross claim of the co-operative corporation and the sponsor’s motion to dismiss the cross claim. The corporation alleges that, if plaintiffs are successful, it no longer will be a qualified co-operative corporation under the Bent Stabilization Law and the code promulgated thereunder, it and its stockholders will be deprived of substantial benefits under the Internal Bevenue Code, and many of its stockholders will be entitled to rescind their purchase agreements. It seeks damages and a judgment declaring the rights of all the parties inter se.
Since I have refrained from adjudicating the validity of the plan, qua plan (indeed, the plan, as such, may be effective) and considering the substantial difference between the factual and legal problems presented, under the complaint and under the cross complaint, I decline to render a declaratory judgment or to decide the demand for incidental relief under the cross claim (CPLB 3001).
The motion to dismiss the cross claim is granted, and the cross claim is dismissed, without costs, and without prejudice to the rights of the co-operative corporation, or any of its stockholders, to bring such action or actions, in law or in equity, as they, or any of them, may be advised.

 The court is informed by counsel for the sponsor that as of February 1,1972, 281 apartments were sold and that of these 281 apartments 59 were resold to the sponsor.