Chief Judge Fulo.
The plaintiffs-appellants are 124 tenants in an apartment building located at 360 East 72nd Street in Manhattan who refused to purchase co-operative interests in their apartments under a plan for the conversion of the building to co-operative ownership. They brought this action, individually and on behalf of all other tenants in the building similarly situated, for a declaratory judgment that their right to renewal of their leases, under the Rent Stabilization Law of 1969, remained and persisted because the co-operative plan never became legally operative and effective in accordance with the requirements of that statute (Administrative Code of City of New York, § YY51-6.0, subd. c, par. [9]) and the Real Estate Industry Stabilization Code promulgated under it (Code of Real *530 Estate Industry Stabilization Association of New York City, § 61, subd. 4, par. [a]). The suit is against the sponsor of the plan (the estate of Alfred L. Kaskel), the co-operative apartment corporation (360 East 72nd Street Owners Incorporated), the Administrator of the Housing and Development Administration and the Beal Estate Industry Stabilization Association of New York City.[1]
Tenants protected by the Bent Stabilization Law and the Industry Code are entitled to renewals of their leases unless, among other circumstances, the apartment house in which they live has legally and properly been converted — as required by the provisions of statute and code — to co-operative ownership. It is required, in order to accomplish such a conversion, that the co-operative offering plan be “ accepted for filing ” by the Attorney-General, under section 352-e of the General Business Law, that the plan contain “ no discriminatory repurchase agreement or other discriminatory inducement ” and that 35% of the tenants subscribe to the plan. In the ease before us, although the plaintiffs claim that the repurchase offer contained in the plan is “ discriminatory ” within the sense of the statute, their prime contention is that the sponsor obtained the requisite 35% approval by making false representations to tenants that it had already obtained subscriptions from the number of tenants required and that, had it not done so, it would not have procured such 35% approval. Accordingly, the plaintiffs maintain, the sponsor may not avail itself of the statutory exception — authorizing dispossession of nonpurchasing tenants—in consequence of which their rights as tenants to possession of their apartments and to renewals of their leases may not be disturbed.
The contentions stated, we turn to the facts. Accepted for filing by the Attorney-General on October 24,1969, the co-operative plan here in question was initially submitted to the tenants on November 5. Under the plan, they were invited to buy shares in the co-operative corporation, allocated to dwelling units in the building, and thereby secure proprietary leases to such dwelling units. Of the 456 apartments in the building, 454 were offered for sale — that is, shares allocated to those apartments were offered for sale — and, as required by the Bent Stabiliza *531 tion Law, the plan provided that, when 35% of the tenants had purchased shares in the apartment corporation, the plan would he declared effective.[2]
Some six months after the initial presentation of the plan, in May, 1970, only two persons had agreed to purchase shares in the co-operative corporation, and both were outsiders, not tenants in occupancy at the time the plan was originally presented. To drum up sales, the sponsor submitted to the tenants—following its acceptance for filing by the Attorney-General—the “ First Amendment ” which reduced the price of the building by some $2,000,000 and offered tenants three inducements to purchase shares: the exclusive right for 90 days to buy shares for cash at a discount of 30% from the list price in the original plan; the right to purchase shares at a 20% discount for those who paid 50% of the purchase price in cash and to receive financing for the other 50% from the sponsor at an interest rate of 7%%; reduction of the required down payment from 10% of the purchase price to $1 a share. Despite these inducements, the shares did not sell and, in August of 1970, a ‘ ‘ Second Amendment ’ ’ was promulgated. This amendment extended the right of tenants to purchase at a 30% discount for another 90 days, until November 10, 1969; gave a 25% discount to tenants who paid 25% of the cash price and agreed to finance the remainder over a seven-year period at a 7%% discount; and left unchanged the reduction in the amount of the down payment required. In addition, as a further inducement, the sponsor offered to buy back from the tenants their shares (and the accompanying proprietary *532 leases) within two years after the co-operative corporation took title to the building if they agreed to purchase within the following 90 days.
However, despite these inducements, only 83 of the 155 purchasers required had subscribed to the plan at the close of the specified November 10 cut-off date. Thereupon, the sponsor, through its sales agents, extended the availability of these inducements, including the repurchase offer, for another two days — November 11 and 12-—-and then set in motion an all-out effort to procure tenants to purchase. The results were spectacular; on the following two days, 49 tenants signed agreements to buy shares!
A week later, on November 17, announcing that 184 persons had executed purchase agreements — 29 more than the 155 required — the sponsor declared the plan effective. Following an informal hearing upon a complaint filed by the tenants opposed to the plan that the “ landlord has failed or neglected to procure the required 35 percent approval of the tenants for its co-op plan in accordance with applicable law and statute ”, the Attorney-General, in March of 1971, ruled—for reasons not here pertinent—that the November 17 declaration was “premature.” A month later, in April, 1971, the sponsor again declared the plan effective, this time asserting that 165 purchasers (instead of the 184 previously reported) had approved the plan and, on May 4, the Attorney-General accepted for filing an amendment to that effect.
The plaintiffs thereupon commenced this class action in the Supreme Court. In addition to a judicial declaration that the co-operative plan was improperly declared effective in violation of their rights under the Bent Stabilization Law of 1969, the plaintiffs requested a judgment “ restraining the defendants * * * from refusing to renew leases for [their] apartments unless and until there has been a declaration of effectiveness which complies with the Bent Stabilization Law and Code ”.[3] *533 Although Judge Markowitz, who presided at the trial, found nothing wrong or improper in the inducements offered by the sponsor and contained in the plan (69 Misc 2d 435), he determined that the sales made on November 11 and 12, 1970 were secured as a result of false statements made by the sponsor that the plan had gone 11 over the top ’ ’ and that, as a result, ‘ ‘ they should be excluded from the count for the purposes of the Bent Stabilization Law ” (69 Misc 2d, at p. 442).[4] It followed, therefore, he concluded, that the April 27, 1971 declaration of effectiveness was tainted by the agreements of November 11 and 12, 1970 and that that taint rendered inapplicable to the plaintiffs the Administrative Code provision (§ YY51-6.0, subd. c, par. [9]) authorizing the landlord to refuse to renew a tenant’s lease (69 Misc 2d, at p. 444).
The Appellate Division unanimously modified the resulting judgment, on the law and the facts, by declaring, in essence, that the co-operative plan was properly declared effective, that the plaintiffs have no rights under the Bent Stabilization Law of 1969, that 11 a class action will not be permitted for fraud or duress” since “ [r]epresentations by the defendants and reliance by the plaintiffs may vary from case to case ’ ’ and that the petitioners in the summary proceedings were entitled to possession of the apartments which they had purchased (40 A D 2d 804, 805). The Appellate Division missed the thrust of the plaintiffs’ arguments. (See, e.g., Gilligan v. Tishman Realty & Constr. Co., 283 App. Div. 157, affd. 306 N. Y. 974.) This is not a fraud case for damages in which plaitinffs must show reliance on their part to succeed. (See Tuvim v. 10 E. 30 Corp., 32 N Y 2d 541.) Here, the plaintiffs, nonpurchasing tenants, asserted and demonstrated that the sponsor-landlord resorted to flagrant misrepresentation—and not, to use the *534 Appellate Division’s characterization, “permissible sales puffing ”—in order to put its plan- “ over the top ” and thereby avoid the strictures of the rent laws and defeat the right of the nonpurchasing tenants to remain in possession of their apartments.
Such an action is entirely proper, and Wé agree with the disposition made by the trial court. Accordingly, we affirm the judgment there rendered- which (1) directed “the cooperative corporation, as present owner of the building, to enter into leases with each of the non-purchasing tenants entitled thereto and so demanding, granting him his present rights under the Rent Stabilization Law”; (2) declared that “ [e]xisting proprietary leases are * * * subject to the rights of non-purchasing tenants iii occupancy on November 5, 1969 (3) dismissed the summary proceedings, ‘ ‘ without prejudice to renew on grounds not inconsistent with this decision; ”; and (4) dismissed, without prejudice, a cross claim by the apartment corporation against the sponsor for damages and declaratory relief.
It was very early settled in cases decided under the State’s rent control law and implementing regulations (L. 1946, ch. 274, as amd. [State Residential Rent Law]; Rent and Eviction Regulations of Temporary State Housing Rent Commission, § 55, subd. 3) — and, quite obviously, the same result follows under New York City’s etitergency rent control laws (Administrative Code, § Y51-1.0 et seq.; § YY51-1.0 et seq.) —that “ co-operative apartment plans are subject to [judicial] supervision if their effect may be to frustrate the policy of the State in controlling maximum rents and evictions ”. (People ex rel. McGoldrick v. Sterling, 283 App. Div. 88, 96; see, also, Gilligan v. Tishman Realty & Constr. Co., 283 App. Div. 157, affd. 306 N. Y. 974, supra; Judson v. Frankel, 279 App. Div. 372, 374; Barbee v. 2639 Corp., 284 App. Div. 298, 301; Schumann v. 250 Tenants Corp., 65 Misc 2d 253, 256-257.) More specifically, it was held that tenants subject to eviction in consequence of the co-operation of their building ‘ ‘ have the right to test out the question as to whether the có-operative scheme proposed by the defendants is a device to evade and circumvent the emergency rent control laws intended for [their] protection ”. (Judson v. Frankel, 279 App. Div. 372, 374, supra; Gilligan v. Tishman
*535 Realty & Constr. Co., 283 App. Div. 157, affd. 306 N. Y. 974, supra.)
In the light of these decisions, it is perfectly clear that the plaintiffs in the case before ns have standing to challenge, in a plenary court action, the methods by which the defendant sponsor procured purchase agreements under the plan and are entitled to renewal of their leases if they establish that such agreements were executed as a result of discriminatory inducements, improper pressures or false representations.[5]
Nor do we perceive any objection or obstacle to a class action. The plaintiffs and the other tenants on whose behalf they instituted suit would be ousted from possession were it held that the building was lawfully and properly co-operated. CPLR 1005 (subd. [a]) provides for a class action where a “ question is one of a common or general interest of many persons The present case undoubtedly involves a question of common interest affecting the rights of every nonpurchasing tenant in the building. Under the Rent Stabilization Law, such tenants are entitled to renewal of their leases unless a co-operative plan has properly ■been declared effective. If, therefore, as the plaintiffs urge, the plan was wrongfully declared effective by the sponsor, all nonpurchasing tenants have been injured in precisely the same way.
*536 Furthermore, the relief which the plaintiffs seek—the right to demand renewal leases to their apartments — cannot possibly prejudice the rights of the other members of the class. It seems plain enough that the “ common or general interest ” among the nonpurchasing tenants is at least as great as the common interests which, in the past, have sustained class suits. (See, e.g., Kovarsky v. Brooklyn Union Gas Co., 279 N. Y. 304, 314-315; Lichtyger v. Franchard Corp., 18 N Y 2d 528, 534-535.)6 Accordingly, it is eminently proper that the plaintiffs be permitted to sue on behalf of the other nonpurchasing tenants to protect their rights under the statute and to afford them the opportunity, if they wish to avail themselves of it, to procure renewal leases.
Although we concur in the finding by both courts below that the inducements to buy shares were neither discriminatory nor otherwise improper, we agree with the trial judge that the testimony of the purchasing tenants established that the sponsor was guilty of resorting to improper and impermissible promotion tactics resulting in sales on November 11 and 12, 1970.
The record demonstrates that the sponsor had obtained only 83 of the required 155 tenant-subscribers by the November 10 cut-off date for the proffered inducements — although the plan had been before them for some 12 months—but that on extending that period for another two days, the sponsor enjoyed enormous success, obtaining 49 additional agreements to purchase shares. Such success, as the trial court found — and it is supported by the weight of evidence—was attributable to the sponsor’s resort, as an integral part of its sales campaign, to false representa-
6. As indicated, the present case differs sharply from actions in fraud for damages or rescission—where, of course, reliance is a predicate to recovery (see Tuvim v. 10 E. 30 Corp., 32 N Y 2d 541, affg. 38 AD 2d 895, 896, supra) — in which we have held that a class suit was unauthorized because “ separate ■wrongs ” had been done to each member of the putative class. (Society Milion Athena v. National Bank of Greece, 281 N. Y. 282, 292; see, also, Coolidge v. Kaskel, 16 N Y 2d 559; Brenner v. Title Guar, & Trust Co., 276 N. Y. 230; see, also, Onofrio v. Playboy Club of N. Y., 15 N Y 2d 740; Gaynor v. Rockefeller, 15 N Y 2d 120, 129-130.) In those eases, unlike the one before us, determination of the merits of each claim must, perforce, turn on the particular facts and circumstances involved; alternatively, the class , action was held not to lie because a choice of remedies was available and each member “'[was] free to determine for himself the remedy for redress of his grievance ”. (Gaynor v. Rockefeller, 15 N Y 2d 120, 129, supra.) *537 tions to tenants that the plan had been approved, or was about to be, in a calculated effort to induce them to buy as the time for acceptance of the plan, with its favorable inducements, was about to expire.
“ Obviously, the most obsessing fear of a tenant confronted with a co-operative proposal, and the most paralyzing weapon in the arsenal of the promoter,” observed the court in the quite similar Gilligan case (283 App. Div. 157, 162, affd. 306 N. Y. 974, supra), “is the possibility that 80% of the tenants [the percentage there required] will purchase stock and that immediate application will be made for the eviction of the nonpurchasing tenants. In a tight rental market, when it is most difficult to obtain comparable dwelling space, tenants check the sales to their cotenants; and if they feel that substantial progress is being made toward procuring the dreaded [percentage], many will perforce capitulate.” Or, as Judge Markowitz put it in the course of his opinion below, “ Once the word was passed that the requisite 35% had signed up, other tenants, to protect their homes, inevitably joined the buyers ” (69 Misc 2d, at p. 442).
Illustrative of the testimony given upon the trial by the purchasing tenants is that of Mrs. Wolff. She flatly told the sales agent, who came to her apartment on November 12 to persuade her to buy, that she ‘ ‘ was not interested in purchasing [her] apartment” and would do so only “if the building got their 35 per cent, because then I felt I had to.” The sales agent, she said, stated unequivocally “ 1 this is absolutely a fact; we do have 35 per cent; as a matter of fact, this evening [November 12] we are having a celebration because of that.’ ” (Italics supplied.) Thereupon, she signed. She would not have done so, she emphasized, had she not been ‘ ‘ advised * * * that the 35 per cent [had been] attained ”.[7]
*538 Testimony such as this, coming as it does from tenants who actually signed agreements to purchase their apartments can hardly be ignored, especially where, as here, it is accompanied by proof of the plan’s startling success on the two critical days in quesion. It seems plain that, once this sort of evidence of illegal sales pressure has been introduced, it is incumbent on the sponsor to go forward with controverting evidence that its sales agreements were, in fact, lawfully obtained. (See, e.g., Gilligan v. Tishman Realty & Constr. Co., 283 App. Div. 157, affd. 306 N. Y. 974, supra.) This burden, the sponsor has totally failed to satisfy. In point of fact, the sponsor does not even contend that the asserted misrepresentations concerning the success of the plan were not made. More, the record shows that, although a sales agent — the one who maintained the sales office in the building—was actually in the courtroom during testimony singling her out as the source of many of the offending statements, she was not called to the stand to contradict such testimony or to justify her conduct. Nor has the sponsor made any attempt to show that the misconduct attributed to its sales agents was confined only to the tenants who testified and was not widespread and characteristic of its sales tactics throughout the campaign.
Instead, the sponsor seeks to justify such conduct by asserting that there were no misrepresentations of “ fact ” made during the sales push; that ‘ ‘ rather only opinions of probability with respect to the future ” were made; and that these opinions had a reasonable basis in fact. In the first place, as noted, false representations, indisputably of existing fact, were made to the tenants that ‘ ‘ we do have 35 per cent ’ ’. In the second place, as to the “ opinions ” circulated — that “ it looks as if we have gone over the mark”—it is sufficient to point out that the sponsor simply failed to offer any proof that the statements had any basis in fact whatever; actually, .so far as the record indicates, when the sponsor put its sales campaign into high gear, the prospects for the successful culmination of the plan were exceedingly dim.
*539 The sponsor further contends that the tenants’ testimony reflects, not reliance upon its alleged misrepresentations, but rather a desire on their part to have the advantage of the option (to resell) which expired on November 12. This lacks merit. A perusal of the trial testimony (see supra, pp. 537-538) demonstrates that the tenants would not have agreed to purchase their apartments had it not been for the false impression created that the plan was a success; actually, as Mrs. Wolff put it, they bought their apartments because they felt they “ had to” in order to “ remain living there.”
In the light of all this, the sponsor should not be permitted to include the sales made during the critical two-day period in November, 1970 in order to bring the total of purchasing tenants up to the required 35%. This conclusion follows from fundamental and long-settled principles of equity jurisprudence. (See, e.g., Deitrick v. Greaney, 309 U. S. 190, 196; Piper v. Hoard, 107 N. Y. 73,76; Rice v. Manley, 66 N. Y. 82, 87.) As stated many years ago in Piper v. Hoard (107 N. Y. 73, 76, supra), “ The spectacle of an individual enjoying property acquired by means of an admitted fraud is not one which appeals with any great force to the sympathies of a court in a civilized land in behalf of the perpetrator of the fraud.” Moreover, this position finds solid support in the decisions imposing on promoters of co-operative schemes, in buildings subject to the emergency rent laws, ‘ ‘ the most rigid standards of fair dealing and good faith toward tenants ”. (Gilligan v. Tishman Realty & Constr. Co., 283 App. Div, 157,162, affd. 306 N. Y. 974, supra; see Judson v. Frankel, 279 App. Div. 372, 374, supra; Woods v. Burg, 82 F. Supp. 242.)
The Gilligan case (283 App. Div. 157, affd. 306 N. Y. 974, supra) is particularly pertinent. There, as here, nonpurchasing tenants, claiming that the sponsor had succeeded in obtaining the requisite percentage (80%) of tenants to purchase apartments by means of false representations and other improper sales practices, brought an action (under the State’s rent law) for a judgment declaring that the ‘1 plan for the co-operative ownership of the apartment building was illegally conceived and executed and therefore never became legally operative ” (283 App. Div., at p. 158). There was “ substantial evidence ” in Gilligan ‘ ‘ that only a negligible number of tenants in occupancy had purchased stock and secured proprietary leases for *540 their apartments prior to the original cut-off date fixed hy Realty [the sponsor]; that the entire co-operative enterprise had hogged down, to the [sponsor’s] dismay * * *; and that to consummate the plan it made threats not justified under the circumstances, made material misrepresentations, offered premiums to tenants to move out and discriminatory contracts to tenants to purchase their apartments, all in an effort to stampede the tenants into purchasing or vacating their apartments ” (283 App. Div., at p. 161). Although the court at Special Term dismissed the complaint at the close of the plaintiffs’ case, the Appellate Division reversed. Adopting the position of the State Rent Administrator—that “ ‘ the right of the recent purchaser of stock allocated to a cooperative apartment to evict the tenant in possession must be limited to avoid improper pressures upon such tenants to purchase stock in dormant or new corporations ’ ”—the Appellate Division declared that “ [o]ther courts have not needed so explicit a guideboard to impose on promoters of co-operative apartment ventures the most rigid standards of fair dealing and good faith toward tenants” (283 App. Div., at pp. 161-162).
It follows, therefore, as we have already stated, that the co-operative plan in the present case may not be allowed to defeat the rights of the nonpurchasing tenants, since the sponsor has failed to rebut their showing that it obtained the requisite approval by improper means.
Concluding, as we do, that the nonpurchasing tenants in this case are entitled to renewal of their leases, it is necessary to add only that there is no equitable reason why such relief should not be granted. If, as suggested, our decision puts in jeopardy certain Federal tax deductions allowed by section 216 (subd. [a]) of the Internal Revenue Code to shareholders of a qualifying co-operative apartment corporation, the innocent purchasers under the plan are fully able to protect themselves from such financial loss — and, indeed, from any other damage suffered in consequence of the sponsor’s wrongdoing—by proceeding against the latter for damages or rescission. And, although the petitioners in the summary proceedings will not be able to obtain possession of the apartments for which they hold proprietary leases, it is of significance that almost all of them purchased apartments merely as a speculative profit-making *541 venture and not to obtain dwelling units for themselves. In short, no equitable basis exists for permitting the purchasers of stock under the plan, innocent though they be, to challenge the plaintiffs’ right to protection from exposure to eviction from their homes and, accordingly, the relief the plaintiffs seek—and to which the record facts entitle them—must be granted.
The order appealed from should be reversed, with costs, and the judgment of the trial court reinstated.
Judges Burke, Breitel, Jasen, Gabrielli and Jones concur; Judge Waohtler taking no part.
Order reversed, etc.

. The latter two defendants are not parties to this appeal.

. The Real Estate Industry Stabilization Code, authorized by the Rent Stabilization Law, provides that the “base” for computing the required 35% shall be “ all residential apartments in the building * * * except those that were vacant and not under lease at the time of the presentation of the Plan ” (Code of the Real Estate Industry Stabilization Association of New York City, § 61, subd. 4, par. [a]). Since in the present case, 11 of the 454 apartments were vacant on November 5 when the plan was initially submitted to the tenants, the sponsor had to secure 155 purchase agreements before it could declare the plan effective. The association’s code further provides that, in meeting the 35% requirement, the sponsor may include as bona fide purchasers not only tenants in occupancy at the presentation of the plan but also purchasers of apartments that became vacant after the plan was presented (§ 61, subd. 4, par. [a], cl. [ii]). We confirmed the legality of this provision in Kovarsky v. Housing & Development Admin. (31 N Y 2d 184, 189-191).

. The co-operative apartment corporation took title to the building on May 27, following denial of the plaintiffs’ motion to prevent such transfer. Some six or seven purchasers of apartments under the plan then instituted summary eviction proceedings in the New York City Civil Court against the occupants of the apartments which they had purchased. On motion, these proceedings were removed to the Supreme Court and tried together with the present action.

. “ Once the word was passed that the requisite 35% had signed up,” the trial judge wrote, “ other tenants, to protect their homes, inevitably joined the buyers. * * * For present purposes, we need not decide precisely the number of tenants who bought shares because of this conduct; nor need we decide precisely which of these tenants would have bought shares in any event. Whatever the precise number, I am convinced that, while the plan may be binding on those who purchased shares, sufficient of the purchasing tenants did succumb to the sponsor’s pressure to subvert the provisions of the Rent Stabilization Law. Techniques had been used by the sponsor beyond mere salesman’s puffing ” (69 Misc 2d, at pp. 442, 444).

. We would but add that the plaintiffs were not required to present such contentions in the first instance to the Attorney-General under section 352-e of the General Business Law. That section — originally enacted in 1960 (L. 1960, ch. 987)—provides that, before a co-operative plan may be presented to the tenants, it must first be filed with the Department of Law setting forth without material omission or misstatement the “ details ” of the proposed offering as' well as the other information required by that statute and its implementing regulations (13 NYCRR 17.1 et seq.) and accepted for filing by the Attorney-General. The statutory scheme, therefore, clearly vests exclusive primary jurisdiction in that official to consider the sufficiency of the language and content of the plan, and his determination that the plan has complied with the disclosure requirements of the statute is properly reviewable only in an article 78 proceeding. However, there is no basis for assuming that the enactment of section 352-e was intended to deprive the court of its traditional equitable jurisdiction to consider claims of illegality on the part of the sponsor apart from noncompliance with that provision. (See Schumann v. 250 Tenants Corp., 65 Misc 2d 253, 256-257, supra; see, also, Barbee v. 2639 Corp., 284 App. Div. 298, 301, supra.)

. Another of the purchasers who testified (Mrs. Ket chain) also stated that she “wasn’t interested” in buying her apartment but was told by various of the sponsor’s sales agents — falsely, as already noted — that the plan was “on the brink of going over, or on the verge of having the number of people, 35 per cent * * * and therefore if I didn’t do it I might * * * not have a place to live.” A few days later, she agreed to purchase. She explained that, “ I was a widow and I didn’t •—• I had to have some place to live, and so I thought it was the best of two evils, to pay for the apartment and wait to *538 see what would, happen.” Mrs. Ketcham subsequently sought to rescind her agreement when, in March, 1971, the Attorney-General determined that 35% had not approved the plan. Testimony by a number of the other purchasing tenants is to the same effect.