OPINION OF THE COURT
Shirley Fingerhood, J.
Plaintiffs are tenants of an apartment house at 239 Central Park West which defendant sponsor-sellers seek to *26 convert to co-operative ownership. Plaintiffs move for an order enjoining the sale of apartments pursuant to an offering plan submitted to and filed by defendant Attorney-General. The Attorney-General cross-moves pursuant to CPLR 3211 (subd [a], par 7) for an order dismissing the action against him for failure to state a cause of action.
Section 352-e et seq. of the General Business Law requires that a prospectus or offering statement (hereinafter Plan) be filed with the Attorney-General before shares in a co-operative corporation are offered for sale. The complaint alleges that the Plan which was accepted for filing by the Attorney-General is fraudulent and unconscionable for the reason, inter alia, that shares of stock were allocated to apartments fraudulently. Plaintiffs claim that the share allocation, which determines the price to be paid for each apartment, does not reflect the true value of the various apartments but serves instead as a discriminatory inducement to purchase to tenants of some rent controlled and rent stabilized apartments. By means of that discriminatory inducement, it is alleged, the agreement to purchase apartments by the 35% of the tenants in rent controlled and rent stabilized apartments required in order to have the Plan declared effective, has been obtained.
The complaint is dismissed as against the Attorney-General. The Attorney-General has no obligation to investigate the facts underlying a disclosure statement before he accepts it for filing. Such acceptance does not constitute approval and the Plan is required to so state, and does. The purpose of the disclosure statement is to give potential purchasers statutorily required information and the Attorney-General’s duty is to scrutinize a Plan for omissions of facts deemed material. (Matter of Whalen v Lefkowitz, 36 NY2d 75, 78; 710 Park Ave. Tenants Assn. v Attorney-General of State of N. Y., NYLJ, May 9, 1979, p 11, col 1, affd NYLJ, Oct. 22, 1979, p 6, col 4.)
The Attorney-General may, in his discretion, conduct an investigation into the truthfulness of statements set forth in the Plan, including the statement in issue here that “the price of each block of shares bears a reasonable relationship to the portion of the fair market value * * * attributable to the apartment to which the block of shares is *27 allocated” (General Business Law, § 352-e, subd 1, par [b]). However, his decision to conduct such an investigation, or not to do so, is a discretionary act in his administrative capacity, not reviewable by the courts. (Matter of Greenthal & Co. v Lefkowitz, 32 NY2d 457; Matter of Whalen v Lefkowitz, 36 NY2d 75, 79, supra.)
We come next to plaintiffs’ case against the other defendants and the motion for a preliminary injunction. Plaintiffs clearly have standing to challenge the methods by which defendant sponsor-sellers procured purchase agreements under the Plan. (Richards v Kaskel, 32 NY2d 524; Gilligan v Tishman Realty & Constr. Co., 283 App Div 157, affd 306 NY 974; Judson v Frankel, 279 App Div 372; Matter of Hoenig v McGoldrick, 281 App Div 663.) The relevant decisions impose “on promoters of co-operative schemes, in buildings subject to the emergency rent laws, ‘the most rigid standards of fair dealing and good faith toward tenants’ ” (Richards v Kaskel, 32 NY2d 524, 539, supra).
It is with that standard of good faith that the court must appraise plaintiffs’ charge that the unduly low value attributed to the “D” and “E” lines of apartments induced the tenants in those lines to agree to purchase their apartments and thereby achieved the 35% of rent controlled and rent stabilized tenants required for the Plan to become effective. For, if that contention be true, the sponsor-sellers are attempting to effectuate a co-operative conversion by circumventing the rent control and rent stabilization laws; sponsor-sellers might also realize a price for their real property in excess of that to which the tenants would agree if each were required to pay a more equitable share and therefore had the incentive to negotiate as a group. In effect, if the allocation is skewed as claimed by plaintiffs, the sponsor-sellers would gain at great cost to tenants of the apartments in the “A” and “B” lines, because the Plan would become effective as a result of the “bargain” offered to tenants of the “D” and “E” lines.
If that be true, the cost to plaintiffs consists not only of the additional price to them of their shares over the price in a fair allocation, but also the excessive share they will have to pay of the maintenance and assessment for im *28 provements and the mortgage if it is not extended in 1983. The impact of excessive charges may, if these tenants wish to. sell their apartments, force a lower sales price or, if there should once again be a buyer’s market for co-operative apartments, preclude a sale entirely.
The court, cannot, on this application, determine the propriety of the allocation of value to the various apartments. It can and must, however, examine the method by which that allocation was established to determine whether plaintiffs make a prima facie showing that defendant sponsors have not met “the rigid standards of fair dealing and good faith” imposed by prior decisions.
The allocation is substantiated in the Plan only by a statement of an employee of the sales agent that he, an experienced agent, believes it to be fair. He is, of course, the employee of an interested party, a firm which will gain substantial financial advantage if the Plan becomes effective. Neither in the prospectus nor in the affidavits in opposition to this motion does he proffer the opinions of other experts. (See Smit v Lexington Madison Co., 73 Misc 2d 442, 446, in which three companies submitted proposed allocations independently of each other prior to the establishment of the allocations in the Plan.) In his affidavit in opposition to the motion, the agent describes his method of allocation as follows: he attributed 54% of the value to the “A” and “B” lines because they contain 48% of the net square feet and have additional value because they face Central Park West. He adds, “[t]he method of reaching a reasonable allocation of shares for apartments within a premises, for purpose of cooperative conversion, is based upon subjective expert opinion”. The defendants also state that the rooms in the “A” and “B” lines are 5% larger than the others.
Plaintiffs’ affidavits agree that the apartments on Central Park West are more valuable and contain more footage, but they contend that the differential in value is excessive. The price and maintenance per room for the “A” line apartments is alleged to be between 40% and 54% more than the “C”, “D” and “E” lines; and for the “B” line apartments between 34% and 46% more than the “C”, “D” and “E” lines. The court’s calculations show those differ *29 enees to be correct. Accordingly, the question becomes whether Central Park frontage (and 5% larger room size if substantiated) warrant that differential in price and charge per room.
Surely, a decision which vitally affects a significant aspect of the lives of tenants, their continuation as rent controlled and rent stabilized tenants, should be based on more than subjective expert opinion by an employee of an interested party. There are other experts; other apartment buildings on Central Park West have been converted to cooperatives, some on tenants’ initiative, and value has no doubt been attributed to the Central Park view. Possibly, projections can be made from rental apartments built in recent years where rentals were not affected by rent controls.
Section 61 of the Code of the Real Estate Industry Stabilization Association and the regulations governing eviction of rent controlled tenants provide that a certificate of eviction will not be granted to the purchaser of an apartment occupied by a rent controlled or rent stabilized tenant unless the shares in the co-operative have been sold without discriminatory inducement. “[Tjhere is no point in permitting equities to harden still further by relegating tenants to the alternative of some future appearance before the Administrator, to oppose issuance of certificates of eviction” (Gilligan v Tishman Realty & Constr. Co., 283 App Div 157, 164-165, supra). To do so would foreclose plaintiff tenants from purchasing their apartments if the administrator, or a reviewing court, finds the allocation fair. And possibly worse, if plaintiffs prevailed before the administrator, or a court reviewing his decision, purchasing tenants might find that the 80% of gross income from tenant stockholders required for tax deduction had not been achieved and their apartments were a luxury they could neither afford nor sell.
For if the plan is declared effective, plaintiffs must purchase their apartments or face the prospect of being evicted; if they, or some of them, did not purchase, the tenants who wish to purchase their apartments and have executed affidavits on defendants’ behalf may, having purchased their apartments, see the issue brought to another *30 forum. Accordingly, it is in the interest of not only plaintiffs but also the tenants who wish to purchase their apartments to have this matter decided now. The status quo should be preserved until the fairness of the allocation of value to the apartments can be determined at trial.
“This is precisely the situation in which a preliminary injunction should be granted to hold the parties in status quo while the legal issues are determined” (Tucker v Toia, 54 AD2d 322, 326; Wuertz v Cowne, 65 AD2d 528; Sonesta Int. Hotels Corp. v Wellington Assoc., 483 F2d 247). The preliminary injunction is granted on condition that plaintiffs proceed to trial immediately without seeking adjournments. Pending the trial, all actions of defendants to implement the co-operative conversion Plan will be stayed and the rent controlled and rent stabilized tenants’ time to exercise their exclusive right to subscribe to the shares of stock allocated to their apartments at the offering price shall be extended until such time after his decision as the Trial Judge shall determine.